160 So. 77

## STATE v. J. WATTS KEARNY & SONS.

## STATE v. J. J. CLARK CO., Inc.

Nos. 33136, 33139.

Nov. 26, 1934.

Dissenting Opinion Dec. 14, 1934.

On Rehearing March 4, 1935.

Monroe & Lemann and Nicholas Callan, all of New Orleans, for appellant J. Watts Kearny & Sons.

Dart & Dart and Leo L. Dubourg, all of New Orleans, for appellant J. J. Clark Co., Inc.

Charles J. Rivet, of New Orleans, for the State.

LAND, Justice.

These cases have been consolidated for trial, as the issues involved in each are the same.

The state has proceeded by rule in each case to collect from defendants, appellants, a retail license tax for the years 1929, 1930, 1931, and 1932, together with 2 per cent. per month interest on the amount claimed for each year from March 1st, and 10 per cent. attorney's fees on the total amount of principal and interest.

The defense in each case is a denial that defendant is liable for a retail license tax. Defendants aver that they are engaged in the business of selling building materials at wholesale; that the sales classified by the state as retail sales for these years were merely incidental to the business carried on by defendants; and that these sales average only a small percentage of the total sales for the years in question.

Judgments were rendered in the court below against defendants for a retail license tax for the years 1929, 1930, 1931, and 1932, and the correctness of these judgments, as to amount, is admitted by defendants, if it should be held that they are liable for such tax.

Defendants sell, first, to dealers; second, to contractors and subcontractors; third, to municipalities and public boards; and, fourth, to consumers.

Sales are made to all comers, without inquiry as to what the purchaser is going to do with the material. Anybody can give defendants an order that will be filled and delivered at domicile.

The state contends that such operations require an occupational license tax both as wholesaler and as retailer, under section 30 of Act No. 205 of 1924, and which provides: "That when any two or more kinds of business are combined, except as herein expressly provided for, there shall be a separate license required for each kind of business."

In City of New Orleans v. U. Koen & Co., 38 La. Ann. 328, 330, it is said: "As the law reaches dealers who transact operations, either as wholesale or as retail merchants, separately, it undoubtedly affects them when they do both indiscriminately."

Section 7 of Act No. 205 of 1924, as amended by Act No. 132 of 1928, imposes the tax on "wholesalers" and defines "wholesaler" as follows:

" 'Wholesaler' defined.

"Provided, that no person or persons shall be deemed *wholesale dealers* unless he or they sell *by the original or unbroken package or barrel only;* and provided further, that no person or persons shall be deemed *wholesale dealers* unless he or they sell *to dealers for re-sale.* If they sell *in less quantities* than original unbroken package or barrel, they shall be considered *retail dealers* and pay license as such." (Italics ours.)

It is clear from the language of this section that, to constitute a "wholesaler," he must not only sell "by the original or unbroken package," but that he must sell also *"to dealers* for re-sale." (Italics ours.)

In construing section 7, above quoted, in State v. Milam Grain & Milling Company, 176 La. 541, 146 So. 47, 48, this court said: "In our opinion, the provision of section 7 of the license act of 1924, quoted supra, *admits of but one interpretation,* viz., that a wholesaler who sells in unbroken packages direct to consumers, on one who sells in broken packages to dealers, for resale, is subject to the payment of a retail license."

It is not left to the discretion of this court to define a "wholesaler," as the Legislature of this state, in clear and unambiguous language, has declared that the "wholesaler" is one who must sell in unbroken packages to *"dealers* for re-sale."

It follows, necessarily, that if the contractors and subcontractors, and the municipalities and public boards to which defendants sell in unbroken packages, are not "dealers for re-sale," then defendants are not wholesalers in such transactions, but must pay the state a retail license on such sales.

The word "dealer" is defined in Words and Phrases, Vol. 1 (Second Series) pp. 1222 and 1223 as follows:

" 'Dealers' are the middlemen between the manufacturers or producers and consumers. Commonwealth v. Vetterlein, 63 A. 192, 193, 214 Pa. 21 (quoting Commonwealth v. Campbell, 33 Pa. 380).

"A 'dealer' is one whose business it is to buy and sell merchandise, goods, and chat-

tels, as a merchant, storekeeper, or broker; the term being synonymous with 'trader.' State v. Rosenbaum, 68 A. 250, 251, 80 Conn. 327, 15 L. R. A. (N. S.) 288, 125 Am. St. Rep. 121. * * *

" 'Dealer,' in the popular and therefore the statutory sense of the word, is not one who buys to keep or makes to sell but one who buys to sell again. He stands immediately between the producer and the customer and depends for his profit, not upon the labor he bestows upon his commodities, but upon the skill and foresight with which he watches the markets. Commonwealth v. Vetterlein, 63 A. 192, 193, 214 Pa. 21 (quoting Norris v. Commonwealth, 27 Pa. 494)."

A contractor who buys building material is not one who buys and sells—a trader. He is not a "dealer," or one who habitually and constantly, as a business, deals in and sells any given commodity. He does not sell lime and cement and nails and lumber.

His undertaking is to deliver to his obligee some work or edifice or structure, the construction of which requires the application of skill and labor to these materials so that, when he finishes his task, the materials purchased are no longer to be distinguished, but something different has been wrought from their use and union. The contractor has not resold but has consumed the materials. Sales to contractors are sales to consumers, and, for this very reason, the Legislature did not include contractors and subcontractors in the term "dealers for re-sale," as used in section 7 of Act No. 205 of 1924, but has placed them in an entirely different classification in section 24 of that act. Consequently, contractors and subcontractors are not licensed at all as wholesale or retail dealers.

Municipalities and public boards make no resale of the commodities they buy, and cannot be classed as "dealers" in such articles.

A wholesaler who sells in unbroken packages direct to consumers is subject to the payment of a retail license, as held in State v. Milam Grain & Milling Co., cited supra.

In holding in that case that the definition of "wholesaler" in section 7 of Act No. 205 of 1924 "admitted of but *one* construction," the court necessarily concluded that this section was couched in language clear and free from ambiguity or doubt.

In such a case, the doctrine of contemporaneous construction invoked by defendants has no application, as there is no room for construction and, consequently, no need to give it aid. Houghton v. Payne, 194 U. S. 88, 24 S. Ct. 590, 48 L. Ed. 888.

Judgment appealed from in each of these cases is affirmed.

O'NIELL, C. J., dissents and hands down reasons.

O'NIELL, Chief Justice (dissenting).

The main question in these cases is whether the business of selling building materials, in very large quantities, to contractors and subcontractors, and to municipalities and municipal boards and commissions, should be classed as a wholesale business or as a retail business, in determining the rate of the license tax to be levied upon the business.

The prevailing opinion rendered in the cases maintains that the business is a retail business, notwithstanding its enormous proportions, because the general license law, section 7 of Act No. 205 (as amended by Act No. 132 of 1928), in defining a "wholesale dealer," declares that no one shall be deemed a wholesale dealer unless he sells in original or unbroken packages or barrels *only*, and unless he sells to dealers for resale.

That section of the statute, however, does not undertake to define or determine who are "dealers for resale." Hence that section has nothing whatever to do with the question whether contractors and subcontractors, municipalities, and other governmental agencies, who buy building materials in large quantities only, should be classified as "consumers" or as "dealers for resale."

Sales of building materials, in large quantities only, to contractors and subcontractors and to municipalities and other governmental agencies, are not made in "broken packages." Such building materials as are sold thus in barrels or bags, such as plaster, lime, and cement, are sold in the original or unbroken packages; but the major part of the materials that are sold to contractors or subcontractors, or to municipalities or other governmental agencies, such as bricks, sand, gravel, sewer pipe, water mains and fittings, structural steel, etc., is sold in bulk—generally in carload lots, but never in packages—either broken or unbroken.

It appears to me to do violence to the ordinary acceptation of the terms "wholesale dealer" and "retail dealer," to say that one who conducts a monstrous business, selling building materials in large quantities to con-tractors and subcontractors and to munici-palities, and other governmental agencies, is a "retail dealer," merely because of the use of the phrases "dealers for resale" and "original unbroken package or barrel."

I understand from the majority opinion rendered in these cases that the reason why the defendants, J. Watts Kearny & Sons and the J. J. Clark Company, are being classified as "retail dealers" is, not that their sales to contractors and subcontractors and to the city of New Orleans and the sewerage and water board, etc., are not made "in the original or unbroken package or barrel only," but that a contractor or subcontractor, or municipality or other governmental agency, is not a "dealer for resale." In a strict and narrow sense, no—a contractor or subcontractor might not be deemed a dealer for resale, when he buys building materials for the fulfillment of his contracts. But he is a dealer for resale, in the ordinary and common sense that he makes a profit—and is presumed to charge a profit—on the materials which he disposes of in fulfilling his contracts. He is a dealer in building materials, as much as in labor and skill; and, inasmuch as he buys and disposes of the materials for profit, he is a dealer for resale. He is certainly not a consumer of the materials which he buys for the purpose of transferring to his customers, and which in fact he does transfer, for a profit, in a business for the carrying on of which he pays a license tax.

In the case of the City of New Orleans v. LeBlanc and Beck, 34 La. Ann. 596, the defendants were coopers, but were engaged also in buying and selling hoop poles; and it was held that, as coopers, they were manufactur-

ers and exempt from a license tax, but that, as to the hoop poles, which they bought to sell "to smaller dealers," they were dealers. In so deciding, Chief Justice Bermudez, for the court, said: "In other words, dealers are middlemen between the manufacturer or the producer and the consumer." In that sense, a contractor is a dealer in the building materials—and not a consumer of the materials—which he buys and disposes of in the fulfillment of his contracts.

In the case of State v. Chickasaw Wood Products Co., 169 La. 1179, 126 So. 914, 916, the defendant was engaged in the business of manufacturing barrels, some of which were sold to a cotton oil company, and some to a molasses company. They used the barrels as containers for the oil or molasses which they sold. By a proviso in the twenty-fifth section of the license law (Act No. 299 of 1926), manufacturers were exempted from the payment of a license tax on the sales of their manufactured articles from their manufacturing plants or warehouses "to dealers for resale." Hence the question was whether the cotton oil company and the molasses company were "dealers for resale," with regard to the barrels in which they shipped their cotton oil or molasses. The court held that the cotton oil company and the molasses company were "dealers in barrels for resale," because "the price or cost of the barrel" was included in the sale of the cotton oil or molasses. I did not subscribe to the ruling in that case because it did not appear that either the cotton oil company or the molasses company was making or charging a profit on the barrels which they used in their business, and which were probably charged to expense account—as I imagine a retail merchant does with regard to the wrapping paper used in his business. It must be conceded, though, that the question in the Chickasaw Case was not an unilateral question. But, since it has been decided that a cotton oil company and a molasses company are dealers in barrels for resale, because, as the court said, "the price or cost of the barrel is included in the price of the oil and molasses," by the same token I say that a contractor is a dealer in building materials for resale, because the cost of the materials—and in fact a profit on the materials, perhaps as great as the profit on the labor—is included in the cost of fulfilling his contracts.

Of course, a contractor is not a "retail dealer," and should not be classified as a "retail dealer," in the levying of a license tax upon his business. But a "wholesale dealer" is not defined as one who sells to "retail dealers," but as one who sells to "dealers for resale." A dealer for resale is not essentially a retail dealer. I believe that the majority opinion which is being rendered in this case, and which, if adhered to, will be very far-reaching, is the result of an overlooking of the fact that a "dealer for resale" does not mean, necessarily, a retail dealer. Building contractors, and municipalities and other governmental agencies, are the most extensive, if not the exclusive, dealers in building materials—aside from the manufacturers and wholesale dealers. But, if building contractors and municipalities and other governmental agencies that buy building materials are not dealers for resale, there are no dealers for resale of building materials, and hence there is no such thing as a wholesale dealer

in building materials, in the meaning which the majority of the members of the court are now giving to the statute. That is the idea that influenced the majority opinion in the Chickasaw Wood Products Company's Case, where Justice Thompson, for the court, said: "We doubt if a dealer can be found in the state whose business is to purchase barrels for resale exclusively and not in connection with some other business in which barrels are a necessary instrumentality in the successful operation of its business." Accordingly, if the big dealers in Louisiana who sell building materials in large quantities to contractors and to municipalities and other governmental agencies are to be classified as "retail dealers," there are no wholesale dealers in building materials in this state, because, surely, those who sell in small quantities, to property owners, for repairing or improving their own property, are retail dealers, because they sell to consumers.

It must be conceded that the business of selling building materials to municipalities and to municipal boards or commissions is not so easily characterized as selling to dealers for resale, as is the business of selling building materials to contractors and subcontractors. But my deliberate judgment is that the business of selling building materials to municipalities and municipal agencies, which business is, essentially, a big business, should be classified as a wholesale business, notwithstanding the statutory definition of a "wholesale dealer" as one who sells to dealers for resale. Municipalities and public boards are not consumers of the building materials which they buy, and the cost of which is passed on to the taxpayers. It seems anomalous to me

that the business of selling building materials in enormous quantities to the city of New Orleans, or the sewerage and water board, or the state highway commission, or the Board of Commissioners of the Port of New Orleans, or to the contractors who are building the Mississippi River Bridge, costing approximately $14,000,000, should be classified and taxed as a retail business, on the theory that the buyers of the materials are not, in every sense of the term, dealers for resale.

In their answers to these suits, the defendants admitted that a small proportion of their sales during the four years on which the back taxes were claimed were made to consumers; that is, to property owners, for their own use. But the defendants claimed that, as the materials were sold in the original packages, and were insignificant in comparison with their gross sales, they did not change the character of the business to that of a retail dealer. The retail sales made by J. Watts Kearny & Sons. during the four years, amounted to only 3.83 per cent. of their gross sales, which averaged $500,000 to $750,000 annually; and the retail sales made by the J. J. Clark Company during the four years amounted to only 2.83 per cent. of the gross sales, which averaged $400,000 to $600,000 annually. It must be conceded that the defendants owe a retail license tax on this small proportion—3.83 per cent. of J. Watts Kearny & Sons' gross sales, and 2.83 per cent. of J. J. Clark Company's gross sales—because section 30 of the statute (Act No. 205 of 1924) provides that, when a retail business is done in connection with a wholesale business, a separate license tax shall be required for each business. See City of New

Orleans v. U. Koen' & Co., 38 La. Ann. 328; City of New Orleans v. Clark & Meader, 42 La. Ann. 10, 7 So. 58; Murrell v. Bokenfohr, 108 La. 21, 32 So. 176; State v. Rittenberg, 112 La. 226, 36 So. 330.

In the case of State v. Milam Grain & Milling Co., 176 La. 539, 146 So. 47, it was held that a wholesale dealer should pay a retail license tax on his entire business, because a part of the sales was made to consumers, even though the sales were made in original and unbroken packages. The defendant in that case failed to show what proportion of the sales were retail sales. I dissented from the interpretation which was given to the definition of a "wholesale dealer," in the seventh section of the statute, because I understood the ruling to be that the entire business of a wholesale dealer was converted into that of a retail dealer by his selling also to consumers, even though the sales to consumers were made in the original and unbroken packages, and were only a comparatively small part of the business. All of which is fully explained in my dissenting opinion in that case. I would have concurred, of course, if the ruling had been that only that part of the business which consisted of sales to consumers was subject to the retail license tax; but the difficulty which was presented was deemed attributable to the defendant's failure to keep a separate account of his sales to consumers.

According to the ruling in the Milam Grain & Milling Company's Case, the defendants here would owe a retail license tax on all of their business if they had failed to show what proportion of their business consisted of sales to consumers. But, inasmuch as each of the

defendants did produce a record showing the proportion of the sales made to consumers, they are liable for the retail license tax on that proportion of their sales only; and the ruling in the Milam Grain & Milling Company's Case is not at all appropriate to this case. According to the undisputed figures, therefore, the firm of J. Watts Kearny & Sons owes a retail license tax of only $25 for 1929, $25 for 1930, $35 for 1931, and $50 for 1932; and the J. J. Clark Company owes $25 for 1929, $35 for 1930, $35 for 1931, and $35 for 1932. The only defense urged against these small claims was that they were mere incidents of the wholesale business, and should not be considered as the carrying on of a separate business. According to the thirtieth section of the statute, however, the defendants owe a separate license tax on their retail business—small as it is.

The main question in these cases is whether the major part of the business done by the defendants, which constitutes 96.17 per cent. of the business of one of them, and 97.17 per cent. of the business of the other, and which consists principally of sales to contractors and subcontractors, and partly of sales to municipal boards, should be classed as a retail business or as a wholesale business. This court has never before had occasion to decide that question. The reason why the question has not arisen heretofore is that the officers whose duty it has been to interpret and enforce the license laws have held, consistently, ever since the provisions of the present license law on the subject have been in existence, that the business done by these defendants, and the business done by others in the same way, is a wholesale business.

The business now conducted by the J. J. Clark Company was established in this city 65 years ago, and has been conducted ever since as it is now; and the business of J. Watts Kearny & Sons has been going on as it is now, continuously, for 48 years. During all of these years the state supervisor of public accounts, who is, ex officio, supervisor of the collection of license taxes, and his inspectors, and the tax collectors and their attorneys, have been aware of the nature of the business conducted by these defendants, and have ruled that the selling of building materials in large quantities to contractors and subcontractors was a wholesale business, within the meaning of the statute. A disinterested member of the bar, who, in 1924, was appointed attorney to assist the tax collector in the collection of delinquent licenses, and who for eight years previously had represented the attorney appointed to assist the tax collector in the collection of delinquent licenses, testified in this case that, during the entire period from 1916 to 1928, his interpretation of the law (and the interpretation of the supervisor and of the tax collectors) was that the business of these defendants—selling building materials in large quantities to contractors and subcontractors—was a wholesale business. He explained that the reason for his interpretation was that the contractors and subcontractors were middlemen, who bought the materials merely to pass them on to their customers, for a profit, in the carrying on of a business for which they paid a license tax. He testified that a conference was had on the subject, in 1916 or 1917, between these defendants and another such dealer in building materials, on the one hand, and the supervisor and the tax collec-

tor and his attorney, on the other hand; and that it was then decided definitely that contractors and subcontractors, buying building materials for fulfilling their contracts, should be deemed "dealers for resale," in the meaning of the statute. The witness testified that the question arose several times afterwards, in consequence of reports turned in by the license inspectors employed by the supervisor, and that in every instance the ruling was adhered to, that the contractors and subcontractors were to be deemed dealers for resale, and that the business of these defendants was therefore a wholesale business. This testimony was corroborated by that of the president of the J. J. Clark Company and by that of two members of the firm of J. Watts Kearny & Sons; and there is no denial or contradiction of the fact that, for more than eighteen years, during which time the law on the subject has been exactly as it is now, all of the officers whose duty it was to interpret and enforce the license law—including the supervisor of public accounts, ex officio inspector of licenses, and the tax collectors and their attorneys—have construed the law to mean that contractors and subcontractors, buying building materials for fulfilling their contracts, are "dealers for resale," and that the business of the defendants is a wholesale business.

With these facts in mind, the defendants in these cases pleaded and relied upon the doctrine of contemporaneous construction. But the court, in the majority opinion rendered in the cases, disposes of the plea by saying that it was decided in the case of State v. Milam Grain & Milling Company that section 7 of Act 205 of 1924 "admits of

but one construction," that the statute is therefore "free from ambiguity or doubt," and hence that the doctrine of contemporaneous construction has no application.

The subscribers to the prevailing opinion which has been rendered in this case have simply overlooked the fact that the decision in the Milam Grain & Milling Company's Case had nothing whatever to do with the question on which the defendants here invoke the doctrine of contemporaneous construction; that is, whether a contractor, buying building materials for fulfilling his contracts, is a "dealer for resale." The only question that was decided—and in fact the only question that was tendered for decision—in the Milam Grain & Milling Company's Case was the question whether sales to consumers, in the original and unbroken packages, were retail or wholesale transactions; and it was decided that such sales were retail sales. The decision had nothing whatever to do with defining or interpreting or construing the term "dealers for resale." And, surely, the decision had nothing to do with the question which is now presented—whether contractors, buying building materials for fulfilling their contracts, are "dealers for resale." That is the question on which the defendants here invoke the doctrine of contemporaneous construction. There is nothing in the statute purporting to define the term "dealers for resale," or indicating whether a contractor buying building materials is a "dealer for resale." Hence it is a mistake to say, with reference to that question, that the statute is "free from ambiguity or doubt."

I have never seen a case that called more appealingly or more persuasively than these cases call for the application of the doctrine of contemporaneous construction. This decision will change the meaning of the law, from the meaning which was given, to it by the public officials whose province it is to write and interpret and enforce such laws, into a meaning which they did not intend it should have. That will not deter or hamper the business hereafter. The building of houses and public works will go on as before, with the additional burden of taxation passed along by the dealers in building materials, to the contractors and subcontractors, and to the municipalities and public boards or commissions, and thence to the taxpayers. The distribution and apportionment of the burden of taxation is, primarily, an administrative function—not primarily a judicial function. But this sudden changing of the interpretation of the law—from that which was given to it by the officers who were entrusted with the duty of interpreting and enforcing it—is a great hardship to these defendants, who have been governed by the advice of those alone whose advice they had the right to rely upon. The additional license taxes which the firm of J. Watts Kearny & Sons is now condemned to pay amount to $2,475, but the penalty which is inflicted upon the firm amounts to $3,113.55; that is, $2,605.50 for the interest at 2 per cent. per month, and $508.05 for the 10 per cent. attorney's fee. And the additional license taxes which the J. J. Clark Company is now condemned to pay amount to $1,385, but the penalty which is inflicted upon the company amounts to $1,727.45; that is, $1,444.50 for the interest at 2 per cent. per month, and $282.95 for the 10 per cent. attorney's fee. The judgment against J. Watts Kearny & Sons, therefore,

amounts to, approximately, $5,588.55; and the judgment against the J. J. Clark Company amounts to, approximately, $3,112.45. This serves merely to demonstrate that a judicial decree changing the interpretation of a tax statute may be worse in its hardship than the adopting of an ex post facto law. In this instance, for example, the penalties which are inflicted upon the defendants are the direct consequence of their having been governed by the advice of the public officials whose province and duty it was to interpret the statute, and to advise all parties concerned in the matter.

Of course, the state cannot be estopped from collecting a license tax, by any action or inaction of a public officer. It is so provided in section 1 of Act No. 148 of 1906. But the doctrine of contemporaneous construction is not founded upon an estoppel. An estoppel bars the exercise of a right which once existed; whereas, the doctrine of contemporaneous construction means that the supposed right which is sought to be exercised never existed.

The doctrine of contemporaneous construction has been approved and applied many times by this court, particularly in suits for the collection of taxes. State ex rel. Cunningham, Attorney General, v. Board of Assessors, 52 La. Ann. 223, 26 So. 872, was a mandamus suit to compel the board of assessors to assess for taxes the property of certain schools and colleges where a tuition was charged. For many years the board of assessors and the tax collectors had considered such property exempt from taxation, under a provision in the Constitution of 1879 (article 207) exempting property used for school purposes, places of religious worship, and charitable institutions. Applying the doctrine of contemporaneous construction (page 237 of 52 La. Ann., 26 So. 872, 879), the court said:

"The many years of silence, under the constitution of 1879, is a contemporaneous exposition of the law. A contemporaneous is generally the best construction of a statute. It gives the sense of a community of the terms made use of by a legislature. If there is ambiguity in the language, the understanding and application of it, when the statute first comes into operation, sanctioned by long acquiescence on the part of the legislature and judicial tribunals, is the strongest evidence that it has been rightly explained in practice."

It is said in the prevailing opinion rendered in these cases that there is no "ambiguity in the language" of the statute, on the question now presented; but that statement is founded upon the wrong supposition, that the question which is now presented was disposed of in the Milam Grain & Milling Company's Case.

In State ex rel. Guillot, Tax Collector v. Central Bank & Trust Co., 143 La. 1053, 79 So. 857, 859, the question was whether the bank, having two branch establishments, should have three licenses; and, in deciding that the bank needed only one license, under the doctrine of contemporaneous construction, the court quoted Sutherland on Statutory Construction, viz.:

"The practical construction given to a doubtful statute by the public officers of the state, and acted upon by the people thereof, is to be considered; it is perhaps decisive in

case of doubt. This is similar in effect to a course of judicial decisions. The Legislature is presumed to be cognizant of such construction, and after long continuance, without any legislation evincing its dissent, courts will consider themselves warranted in adopting that construction."

In State ex rel. Payne, Tax Collector, v. Exchange Bank, 147 La. 25, 84 So. 481, 482, the question was whether the bank should pay a license tax of $150, or only $75; and that depended on whether the term "declared or nominal capital and surplus," in the license law, included undivided profits. This court decided the case on the doctrine of contemporaneous construction, thus:

"The record discloses—and perhaps the disclosure explains why the court has not heretofore had occasion to pass upon the question now presented—that the auditing department and the bank examining department of the state government have heretofore consistently interpreted the expression in paragraph 2 of section 3 of Act 171 of 1898, 'the declared or nominal capital and surplus,' as not including undivided profits. If that interpretation had not been in accord with the intent and meaning of the legislators who framed and enacted the law, the phrase would have been changed, so as to include undivided profits, at one of the many sessions of the Legislature held during the past 32 years."

In the case of Dominion Land Co. v. Stark, Tax Collector, 156 La. 124, 100 So. 244, 247, a tax was adjudged illegal, under the doctrine of contemporaneous construction, thus:

"It must be observed that the statute involved in this case is one which provides a

revenue for the benefit of the state. There is no law which demands more attention for its enforcement from public officers or in which the individual citizen is more concerned and interested than one which fixes the amount of contribution by the citizen and regulates the collection of that contribution for the support of our government. When once such a law has received an official interpretation, which has been accepted and acted upon for a number of years both by the citizen and the official, such interpretation should not be changed except for clear and cogent reasons. The cases herein cited also involved the construction of revenue laws and the principles therein established are eminently applicable to this case and should be adhered to. It is to the interest of the state and of the citizen that an interpretation of the law affecting the public fisc, once adopted and acted upon for a long time, should not be changed."

State v. Comptoir National D'Escompte de Paris, 51 La. Ann. 1272, 26 So. 91, was a suit for a license tax, and the question was whether the defendant's business was, in the terms of the statute, the "business of carrying on a bank." The court decided in favor of the defendant, on the doctrine of contemporaneous construction, saying:

"The contemporaneous construction of a statute by those charged with its execution should not be disregarded except for cogent reasons, and unless it be clear that such construction was erroneous; and particularly is this true when the changed construction operates retroactively, and imposes upon citizens or corporations charges or exactions for doing business to which they were not subjected under the construction which obtained

when such business was entered into and while it was being conducted."

In the case last quoted the court cited several decisions by the Supreme Court of the United States, applying the doctrine of contemporaneous construction, among them being United States v. Johnston, 124 U. S. 236, 8 S. Ct. 446, 455, 31 L. Ed. 389, and United States v. Alabama Great Southern Railroad Co., 142 U. S. 615, 12 S. Ct. 306, 308, 35 L. Ed. 1134. In United States v. Johnston, the court applied the doctrine thus:

"In view of the foregoing facts the case comes fairly within the rule, often announced by this court, that the contemporaneous construction of a statute by those charged with its execution, especially when it has long prevailed, is entitled to great weight, and should not be disregarded or overturned except for cogent reasons, and unless it be clear that such construction is erroneous. Edwards v. Darby, 12 Wheat. 206, 210 [6 L. Ed. 603, 604]; U. S. v. Moore, 95 U. S. 760 [24 L. Ed. 588]; Hahn v. U. S., 107 U. S. 402, 2 S. Ct. 494 [27 L. Ed. 527]; U. S. v. Philbrick, 120 U. S. 52, 59, 7 S. Ct. 413 [30 L. Ed. 559, 561]."

In United States v. Alabama Great Southern Railroad Co., the court said this—which is very appropriate to the case before us:

"We think the contemporaneous construction thus given by the executive department of the government, and continued for nine years through six different administrations of that department,—*a construction which, though inconsistent with the literalism of the act, certainly consorts with the equities of the case,*—should be considered as decisive in this suit. It is a settled doctrine of this court that in case of ambiguity the judicial department will lean in favor of a construction given to a statute by the department charged with the execution of such statute, and, if such construction be acted upon for a number of years, will look with disfavor upon any sudden change, whereby parties who have contracted with the government upon the faith of such construction may be prejudiced." (The italics are mine.)

All that I have said in this dissenting opinion might be summed up in the simple statement that the law and the facts, as well as the equities of the case, sustain the defendants' plea, founded upon the doctrine of contemporaneous construction. That is not disputed in the prevailing opinion. The only reference to the doctrine of contemporaneous construction, in the prevailing opinion, is in the last two paragraphs; which—I say with great respect—are not at all pertinent to the issue. To verify this statement, I now quote the last two paragraphs of the prevailing opinion, viz.:

"In holding in that case [State v. Milam Grain & Milling Company] that the definition of 'wholesaler' in section 7 of Act No. 205 of 1924 'admitted of but one construction,' the Court necessarily concluded that this section was couched in language clear and free from ambiguity or doubt.

"In such a case, the doctrine of contemporaneous construction invoked by defendants has no application, as there is no room for construction and, consequently, no need to give it aid."

It is certainly a mistake to say that the decision in State v. Milam Grain & Milling

Company left "no room for construction" of the statute, as to whether a contractor, buying building materials for fulfilling his contracts, is a "dealer for resale." That is the question on which the doctrine of contemporaneous construction is invoked by the defendants in these cases.

For these reasons I respectfully decline to subscribe to the prevailing opinion rendered in these cases.

### On Rehearing.

FOURNET, Justice.

Act No. 205 of 1924, under which the state tax collector for the parish of Orleans instituted these proceedings, is of general application throughout the state. Section 39 directs the appointment by the Governor of an attorney for each parish to aid the various tax collectors in the collection of the license taxes levied by the act.

There is no evidence in the record of these cases establishing that the several attorneys in the sixty-three other parishes of this state either conferred with or concurred in the opinion of the attorney for the tax collector of the parish of Orleans, who testified in these cases. Nor does the record contain evidence to show that no vendors of building materials in any part of the state have paid, or been called upon to pay, a retail dealer's tax.

Even as to the parish of Orleans the question seems to have been limited to two or three taxpayers and to the opinion of a single attorney.

The witness Voekel, testifying on behalf of the two defendants, says: "Myself and two other building supply dealers had a con-

ference. I don't remember who the attorney of the State Tax Collector was at that time. And after considerable talk, we convinced him that we were wholesale dealers and not retail dealers, and based on that conference we further assumed that we were wholesalers and continued to pay license as such." (Tr. 27, Kearny Case.)

The witness Kearny, after positively stating that he was present and formed part of presumably the same conference, finally was forced to admit that there was no joint conference and that he was not present at any such conference. The occurrence on which he would pitch a contemporaneous construction in favor of his firm was a conversation which he had in his place of business with an unnamed individual who said that he represented the tax collector. (Tr. 23, 24, Kearny Case.)

No public officer was summoned or testified in support of the alleged contemporaneous construction. No officer charged with the administration of the statute has been shown to have ever given a written or a fixed opinion which could serve as a basis for the construction contended for by the defendants.

A reading of the testimony of the single attorney who once represented the tax collector for the parish of Orleans is sufficient to convince us, as it did the district judge, that the opinion expressed by him was not founded upon such considerations as would justify this court to adopt it in the face of the plain language of the statute. (Tr. 32–35, Kearny Case.)

The testimony of this attorney establishes clearly, in contradiction to the positive dec-

larations of the defendants' other witnesses, that these defendants were called upon to pay a retail dealer's license each time that there was an inspection by the representatives of the supervisor of public accounts. (Tr. 36, foot of page, Kearny Case.)

(The testimony is the same in both cases, on this question, but the transcript pages do not bear the same numbers.)

"The mere failure of public officers charged with a public duty to enforce statutory and constitutional provisions in respect to the levy and collection of taxes, or the acquiescence of public officers in conditions that exempted certain property from its fair share of the burdens of taxation, should not be permitted to stand in the way of the correct administration of the law, or be construed to estop more diligent and efficient public officers when they attempt to perform their duty by bringing in to the revenue proper subjects of taxation that had theretofore been allowed to escape the payment of taxes." Louisville v. Louisville Bd. of Education, 157 S. W. 379, 380, 154 Ky. 316.

The foregoing language is particularly applicable in view of the provisions of section 1 of Act No. 148 of 1906 that "no action or inaction of the State * * * shall stop or prescribe or debar its right to proceed, for licenses or additional licenses before the day of prescription shall begin."

We are, therefore, of the opinion that the evidence in the record fails to establish that any contemporaneous construction was ever placed upon the statute to the effect that dealers who sell to contractors, municipalities, and public boards were wholesalers and not subject to the payment of a retail dealer's license.

We find no error in the original opinion handed down in this case.

It is, therefore, ordered that our original decree be reinstated and made the final judgment of this court.

O'NIELL, C. J., and ROGERS and ODOM, JJ., dissent.

O'NIELL, Chief Justice (dissenting from the decision on rehearing).

I am sure that I made no mistake in my statement of the facts of this case; and I do not believe that there is any disagreement in that respect. It is said in the opinion rendered on rehearing "that these defendants were called upon to pay a retail dealer's license each time that there was an inspection by the representatives of the supervisor of public accounts"; but it is also true that, in every such instance, the ruling was that these defendants did not owe a retail dealer's license tax on the sales which they had made to contractors or to government agencies or boards.

I stated, in dissenting from the original opinion and decree in these cases, that this decision would merely compel the wholesale dealers in building materials to add the cost of the retail license tax to the price of their materials, and pass it on to the contractors or governmental agencies, and ultimately to the consumers. But, considering that such sales are usually made on competitive bids and therefore on close margins of profit, I doubt that the wholesale dealers in Louisiana can pay the retail license tax and com-

pete with the nonresident dealers, whose shipments into this state come under the aegis of the Commerce Clause of the Constitution of the United States (article 1, § 8, cl. 3). For that reason of itself I am yet convinced that the construction which has been put upon this statute heretofore by those whose duty it is to enforce it is correct, and that the Legislature did not intend that the term "dealer for resale" should be so rigorously construed as to exclude contractors buying building materials in large quantities and in unbroken packages, for fulfilling their contracts, in a business for which they pay a license tax.

As suggested in the argument of these cases on rehearing, it could hardly be contended that the dealers who sell flour in carload lots, and in the original and unbroken packages, to the bakeries and manufacturers of cakes, soda biscuits, pastry, and the like, are retail dealers, merely because the buyers do not resell the flour in its original state, but convert it into bread, cakes, biscuits, spaghetti, etc. Neither do I believe that the wholesale dealers in groceries or other articles of food, who sell in original and unbroken packages and in wholesale quantities to the hotels and restaurants, should be compelled to pay a retail license tax on such sales, merely because such buyers do not resell these articles in the state in which they buy them, but convert them into something edible, and then dispose of them in a business for which they pay a license tax. I consider these illustrations, which were given in argument, very analogous—but not more so than the Chickasaw Wood Products Company's Case.

For these additional reasons I respectfully adhere to my dissenting opinion.